# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# OCALA DIVISION

RATEEK ALLAH,

    Petitioner,

v.                                                            CASE NO. 5:17-cv-59-Oc-02PRL

WARDEN, FCC COLEMAN – USP I,

    Respondent.
_____/

## **AMENDED ORDER**[1]

This cause comes before the Court on the Petition for Writ of Habeas Corpus (Dkt. 1) filed by Rateek Allah pursuant to 28 U.S.C. § 2241, the response (Dkt. 5), and the reply and accompanying affidavit (Dkts. 7, 9). After careful consideration of the submissions of the parties and the entire file, the Court concludes the petition should be denied.

## BACKGROUND

Rateek Allah is a federal inmate who was incarcerated at the Federal Correctional Complex, United States Penitentiary Coleman I in Sumter County,

---

[1] This order is amended only to correct a scrivener's error. The prior order incorrectly cited 28 U.S.C. § 541. This order is amended to correctly cite 28 C.F.R.§ 541.

Florida, when he filed his petition. Dkt. 5 at 1.[2]  He is serving a 210-month term of incarceration imposed by the United States District Court in the Southern District of Florida.  Dkt. 5-1 at 4-5.  In February 2016, Mr. Allah was disciplined by the Bureau of Prisons ("BOP").  *Id*. at 19, 36.  He contends he did not commit the imposed disciplinary infractions and seeks to overturn the sanctions imposed.  Dkt. 1.  His current release date is calculated at September 2, 2022.[3]

## THE BOP RECORD

On February 2, 2016, Mr. Allah was housed at the Federal Correctional Institution in Estill, South Carolina.  That day, he was written up for insolence, refusing to obey an order, and threatening bodily harm to a BOP staff member (Incident No. 2811425) and for refusing to obey an order and assault without serious injury on a BOP lieutenant (Incident No. 2811415).  Dkt. 5-1 at 7-8 (No. 2811425), 27 (No. 2811415).

---

[2] Using his register number (57330-004), the BOP website shows that he is currently housed at Coleman USP-II.  *See* https://www.bop.gov/inmateloc/,which was last visited on July 11, 2019.  Petitioner filed a change of address reflecting same.  Dkt. 14.

[3] *See* https://www.bop.gov/inmateloc/.  At the time the Response was filed, his release date was March 15, 2022, based on good conduct time.  Dkt. 5 at 1.

## Incident No. 2811425 against Staff Member T. Horvath

At 7:00 a.m., staff member T. Horvath noticed Mr. Allah following her in his wheelchair as she was walking about the compound. Dkt. 5-1 at 7, 20. She noticed he was talking to another inmate "in a loud belligerent tone stating he had not taken his meds in 4 days." *Id.* He said that he was high and would "f– someone up." *Id.* He continued to use "profane language." *Id.* Horvath told him "that was enough" and asked for his identification. *Id.* He told her he did not have it and did not have to give it her, all the while using the same foul language. *Id.*

Horvath asked Mr. Allah to go with her. Dkt. 5-1 at 7, 20. He continued to "be insolent with [her]" until she turned him over to the compound officer, Lieutenant R. Hensley. *Id.* She explained the situation to Lt. Hensley. Dkt. 5-1 at 8, 20. As she walked away, she could still hear Mr. Allah yelling obscenities directed at her. *Id.* He shouted that she was lying about him and she "better [be kept] away from me because I'll f– her up." *Id.* At this time she witnessed him "rais[ing] his arms in the air and pointing in [her] direction" and "moving his feet quickly in a rage as if he wanted to fight staff." *Id.* She remarked that "his focus and rage had begun with [her]." *Id.*

### *Incident No. 2811415 against Lt. R. Hensley*

In view of the situation, Lt. Hensley immediately ordered the compound to be secured. Dkt. 5-1 at 27, 29, 37. He told Mr. Allah that he would be placed in special housing pending the outcome of the incident report. *Id*. Mr. Allah told Lt. Hensley he was not going to special housing, jumped out of his wheelchair, and "got in an aggressive threatening stance." *Id*. At that point, Mr. Allah started shouting "I am going to knock you out before I go to SHU." *Id*. Once the inmates were secure, Lt. Hensley took a step toward Mr. Allah. *Id*. Mr. Allah kicked Lt. Hensley in the groin as he was being taken to the ground. *Id*. Mr. Allah was handcuffed and placed in special housing. Dkt. 5-1 at 9, 27.

### *Disciplinary Proceedings (2811425) – Staff Member Horvath*

Incident report number 2811425 was timely delivered to Mr. Allah, and a BOP investigating lieutenant then advised him of his right to remain silent. Dkt. 5-1 at 7. Referring to the incident, Mr. Allah stated "[t]hat some of what is said in here is true but some of it aren't." Dkt. 5-1 at 9.

The incident report was forwarded to the Unit Disciplinary Committee ("the UDC" or "the Committee"). Mr. Allah made the following comments to the investigator about the incident report: "She [Horvath] told the truth about me

cursing on the sidewalk. Everything was true until she said I was going to f– her up. Never mind. I did say that. The report is true." Dkt. 5-1 at 7.

The Committee referred the charges to the Discipline Hearing Officer (DHO). Dkt. 5-1 at 7. The Committee's recommendation to the DHO included 60 days' loss of good conduct. *Id.* That same day Mr. Allah received written notice of both the discipline hearing and his rights as an inmate. Dkt. 5-1 at 11, 13. He refused to sign either. *Id.*

At the hearing before the DHO on February 17, 2016, Mr. Allah's due process rights were again reviewed with him. Dkt. 5-1 at 18. A staff representative was present and medical evidence was submitted, but no witnesses were present. *Id*. Mr. Allah denied the charges and made the following statement:

> I am not guilty. I was on the phone with a girl and she broke up with me. I was upset. I rolled out with inmate [] and he said something. I told him, you Florida mother f–ers need to be careful, because I will f– you up. She [Horvath] came across the compound and told me to give her my I.D. I told her I didn't have it. She called the lieutenant. I told the lieutenant this f–ing lady is f–ing after me. She said I was cursing and asked for my I.D. She was by the Warden's office. I was cursing the lieutenant. I told him all you are f–ing with the right one. I will f– all of you up. I never threate[ne]d a woman. I cursed and was upset. I have post traumatic stress disorder (PTSD) and it cause me go off. I didn't take my medication for four days prior. I was going

> through a lot of stuff. She may have misunderstood who
> the threats were to, since she was so far away.

*Id*. The mental health evaluation shows that a psychologist determined he was responsible for his behavior when the incident occurred. Dkt. 5-1 at 20, 22. His prior disciplinary record shows that he had previously been guilty of injuring a female staff member's arm when he pulled it through the opening of a food slot tray. Dkt. 5-1 at 20.

The DHO considered the written statement of Horvath, Mr. Allah's disciplinary record, his mental health evaluation, and his own statement. Dkt. 5-1 at 20. Taken into consideration was Mr. Allah's denial that he had ever threatened a woman, which was contradicted by his disciplinary record. *Id*. His claim that his threats were directed to other inmates and staff was belied by Horvath's statement. *Id.* According to the mental health evaluation, Mr. Allah was responsible for his actions at the time of the incident. *Id*.; Dkt. 5-1 at 22. Based on Mr. Allah's lack of credibility and the independent evidence against him, the DHO dropped the charges for insolence toward a staff member (28 C.F.R. § 541.3, Table 1, Code 312) and refusal to obey an order of any staff member (28 C.F.R. § 541.3, Table 1, Code 307). Dkt. 5-1 at 20-21. The hearing officer found that Mr. Allah threatened Horvath with bodily harm in violation of 28 C.F.R. § 541.3,

Table 1, Code 203, based on the "greater weight of the evidence," and disallowed 27 days of good conduct time in addition to other sanctions. *Id*.

### *Disciplinary Proceedings (2811415) – Lt. R. Hensley*

Incident report number 2811415 was timely delivered to Mr. Allah, and a BOP investigating lieutenant then advised him of his right to remain silent. Dkt. 5-1 at 29. Referring to the incident, Mr. Allah stated, "There's no way I could do that. I can barely stand up. I request the video." Dkt. 5-1 at 28.

The incident report was forwarded to the Committee. Mr. Allah made the following comment to the investigator: "I did not do that." Dkt. 5-1 at 29. The investigator noted that he believed the report writer over the inmate. *Id*.

The Committee referred the charges to the DHO. Dkt. 5-1 at 29. The Committee's recommendation to the DHO included the maximum loss of good conduct time and disciplinary segregation. Dkt. 5-1 at 28. That same day Mr. Allah received written notice of both the discipline hearing and his rights as an inmate. Dkt. 5-1 at 29. He chose to have a staff representative present at the DHO hearing. Dkt. 5-1 at 35. He offered medical documents as evidence and requested the DHO review the video. Dkt. 5-1 at 31, 35.

At the hearing before the DHO on February 17, 2016, Mr. Allah made the following statement:

> I am not guilty. I suffer from PTSD and didn't take my
> medication for 4 days prior to this incident. The female
> staff said I was cursing, so she asked for my I.D. The
> lieutenant said let me talk to her alone. Then he came
> back and said I was going to SHU. I felt like they were
> going to jump on me. I told him if I could walk like I did
> two years ago, I would knock all of you out. Then he
> tackled me like a football player. I told him I was going
> to sue him. I shouldn't have said that, because he wrote
> the incident report to excuse his excessive use of force. I
> know it is bad for me to say a cop is lying, but I can't
> kick that high. I always admit to an assault. The video
> does not show that I did that. I was going to transfer to a
> low. I had too much to lose.

Dkt. 5-1 at 35. While the video was taken from far away and did not show the actual kick, it left no question that an altercation occurred and that Mr. Allah walked and "maneuver[ed] well" for thirty yards. Dkt. 5-1 at 37. The medical evidence obtained the day of the incident confirmed that Lt. Hensley suffered a contusion to his groin area. He was prescribed medication and advised not to perform heavy lifting. *Id*.

The DHO considered all the evidence, including Mr. Allah's discipline record, which established that he had threatened staff five times and assaulted staff on six different occasions. *Id*. The DHO relied on Lt. Hensley's statement, the medical assessments of both Lt. Hensley and Mr. Allah, the video, and Mr. Allah's discipline record, as the greater weight of the evidence, to exact disciplinary

action. *Id*. According to the medical records showed, Mr. Allah was responsible for his actions on February 2. *Id.* Also noted was Mr. Allah's lack of candor when he stated he had "always admitted to assaulting staff in the past." *Id*. His disciplinary record shows he denied assaulting staff and often waived his right to attend the hearings. *Id*. The video revealed his agility was sufficient for a kick to the groin to be plausible, particularly in view of the well-documented injury to Lt. Hensley. *Id*. The DHO dropped the charge for refusal to obey an order (28 C.F.R. § 541.3, Table 1, Code 307), found Mr. Allah assaulted Lt. Hensley without serious injury (28 C.F.R. § 541.3, Table 1, Code 224), and disallowed 27 days of good conduct time in addition to other sanctions. Dkt. 5-1 at 37-38.

## SUFFICIENCY OF THE EVIDENCE

Mr. Allah argues that he was denied due process because the evidence against him was insufficient to support the disciplinary punishment he received. Dkts. 1, 7, 9.[4] He claims the video is the best evidence that he did not

---

[4] He does not take issue with any irregularities in the conduct of the disciplinary proceedings. Dkts. 1, 7, 9. In any event, the record shows that the BOP followed the inmate discipline regulations. He was informed of the charges and his right to remain silent at all stages. He waived his right to have witnesses present, although he considers the video as a witness. A staff representative was present at his request. The Court finds that the procedural requirements of *Wolff v. McDonnell*, 418 U.S. 539 (1974), were met. *See also O'Bryant v. Finch*, 637 F.3d 1207, 1213 (11th Cir. 2011) (outlining standards

intentionally kick Lt. Hensley. Dkt. 7 at 4. He stresses that the DHO watched the video and admitted not seeing the kick. Dkt. 1 at 7; Dkt. 7 at 2. He also points out that the officers who witnessed the incident made no mention in their written reports of him kicking Lt. Hensley. Dkt. 1 at 8; Dkt. 7 at 3, 4. His version of the incident is that the kick in the groin was accidental as part of the fall when he was tackled by Lt. Hensley. Dkt. 7 at 3.

He further explains that he got out of his wheelchair and threatened Lt. Hensley because he was afraid of being sent to the special housing unit. Dkt. 7 at 2.[5] He believed at the time that he was in danger, having heard "prison talk" about "how inmates were being [taken] to Lt. [Hensley's] office and being assaulted." Dkt. 7 at 2; *see also* Dkt. 1 at 7 (rumors of beating people in lieutenants' office). He claims his PTSD makes him paranoid that officers are "out to get him and harm him." Dkt. 7 at 3. Finally, he notes that not only was he harmed by the disciplinary action imposed, but he was awaiting a move to a "low" security prison and was instead sent to a maximum security prison.

---

under *Wolff*).

[5] He told Lt. Hensley, "If I was still walking, I would kick all your "a-s!" Dkt. 1 at 7.

## *Standard*

The standard for determining whether the DHO's decision satisfies due process requirements is whether "some evidence" supports the basis of the decision. *Superintendent v. Hill*, 472 U.S. 445, 454-55 (1984). "The relevant question is whether there is *any evidence* in the record that could support the conclusion reached by the disciplinary board." *Id*. at 455-56 (emphasis added). In situations where the evidence is conflicting, the BOP regulations appear to go one step further and require that the DHO's decision be based on "the greater weight of the evidence." 28 C.F.R. § 541.8(f).

Federal courts are not tasked with retrying prison disciplinary actions. *Young v. Jones*, 37 F.3d 1457, 1460 (11th Cir. 1994). "No *de novo* review of the disciplinary board's factual finding is required, but the courts must consider whether at least the decision is supported by 'some facts' – 'whether any evidence at all' supports the action taken by prison officials." *Id.* at 1460 (citation omitted). "The clear implication of *Hill* is that courts are not to conduct exhaustive reviews of findings of prison disciplinary panels." *O'Bryant v. Finch*, 637 F.3d 1207, 1214 (11th Cir. 2011).

For the following reasons, the Court finds that the DHO relied on existing evidence in finding the greater weight of the evidence supported both charges.

### Staff Member Horvath

With respect to threatening a staff member with bodily harm, Mr. Allah confirmed before the Committee that everything Horvath told in her report was the truth. Dkt. 5-1 at 7. She described Mr. Allah's actions in her report in detail. Before the DHO, he admitted that he threatened someone, but he denied that the expletives and intimidating words were directed to Horvath. Dkt. 5-1 at 18 ("[Horvath] may have misunderstood who the threats were to, since she was so far away."). He never denied making the threat.

The DHO found Horvath's statement truthful. Mr. Allah placed his own credibility at issue when he claimed before the DHO that he had never threatened a woman. His prior disciplinary record showed otherwise. Apart from the credibility determination, the DHO addressed his intimations that his actions were beyond his control. As evidenced by the mental health evaluation, he was determined to be responsible for his behavior at the time of the incident. Dkt. 5-1 at 20, 22.

### Lt. Hensley

Mr. Allah denied before the Committee and the DHO that he assaulted Lt. Hensley. Mr. Allah relied on the video "as his witness." After viewing the video,

which was filmed from some distance, the DHO essentially found that it did not refute the fact that Mr. Allah kicked Lt. Hensley.

Mr. Allah takes umbrage with the DHO's statement that Mr. Allah's leg may have flipped up as he fell to the ground. Dkt. 1 at 7; Dkt. 7 at 2. He contends that because Lt. Hensley "initiated the force" (Dkt. 7 at 3), Mr. Allah is not responsible for the consequences of the takedown. The video showed, however, that is was Mr. Allah who initiated the event by rising from his wheelchair and assuming an aggressive stance toward Lt. Hensley. These actions were coupled with verbal threats.[6]

Apart from the video, there was ample evidence before the DHO to find that not only were Lt. Hensley's actions necessitated by those of Mr. Allah, but the kick indeed occurred. Lt. Hensley suffered a contusion from the altercation, which medical evidence confirmed required medical treatment. Other damaging independent evidence included the statements in the incident report from Lt. Hensley and Mr. Allah's questionable credibility, as evidenced by his conflicting statements before the DHO.

---

[6] That the "two witnessing [officers] who wrote memos never stated that [Mr. Allah] kicked [Lt. Hensley]" (Dkt. 1 at 8: *see also* Dkt. 7 at 3), is not dispositive of whether Lt. Hensley was kicked. The correctional officers' memoranda are found at docket 5-1 at 43 (Senior Officer Specialist J. Sheffield) and at docket 5-1 at 44 (Correctional Officer C. Goldwise).

Accordingly, the Court finds at the very least that *Hills*' "some evidence" benchmark has been met on each charge. Even though there was no conflicting evidence in this case, the DHO based the decision on the greater weight of the evidence. Because the evidence against Mr. Allah was sufficient under either the "some" or the "greater weight" standard, the Court denies the petition.

It is therefore **ORDERED AND ADJUDGED** that the Petition for Writ of Habeas Corpus (Dkt. 1) pursuant to 28 U.S.C. § 2241 is denied. The Clerk is directed to enter judgment for Respondent, terminate any pending motions and deadlines, and close the case.

**DONE AND ORDERED** at Tampa, Florida, on July 16, 2019.

s/*William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

<u>COPIES FURNISHED TO</u>:
Counsel of Record
Petitioner, *pro se*